**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2265
_____

ROBERT W MAUTHE MD PC,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,
                                                        Appellant
                            v.

MILLENNIUM HEALTH LLC
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-18-cv-01903)
District Judge:  Honorable Edward G. Smith
_____

Argued:  March 17, 2021

Before:  KRAUSE, PHIPPS, and FUENTES, *Circuit
Judges*.

(Filed: January 19, 2023)

Phillip A. Bock             [Argued]
BOCK LAW FIRM
820 West 41st Street
Suite 35
Miami Beach, FL 33140

David M. Oppenheim
BOCK HATCH LEWIS & OPPENHEIM
134 North La Salle Street
Suite 1000
Chicago, IL 60602

Richard E. Shenkan
SHENKAN INJURY LAWYERS
P.O. Box 7255
New Castle, PA 16107

*Counsel for Appellant*

Paul A. Werner, III    [Argued]
SHEPPARD MULLIN RICHTER & HAMPTON
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, DC 20006

David M. Poell
SHEPPARD MULLIN RICHTER & HAMPTON
70 West Madison Street
Three First National Plaza, Suite 4800
Chicago, IL 60602

*Counsel for Appellee*

_____

OPINION OF THE COURT

_____

PER CURIAM

The Telephone Consumer Protection Act of 1991 made unlawful many unsolicited faxes, and it created a civil action for recipients of such faxes to recover handsomely: a minimum of $500 for each junk fax received. 47 U.S.C. §§ 227, (b)(3). In this case, a doctor's office received a fax for a free educational seminar, and it now pursues class-wide monetary

relief for itself and every other fax recipient. But liability under the TCPA extends only to "unsolicited advertisement[s]," *id.* § 227(a)(5), which this Court has interpreted to mean communications that promote the sale of goods, services, or property, *Fischbein v. Olson Rsch. Grp., Inc.*, 959 F.3d 559, 562 (3d Cir. 2020). Because under an objective standard, no reasonable recipient could construe the free educational seminar fax as an unsolicited advertisement for goods, services, or property, we will affirm the District Court's grant of summary judgment to Defendant.

## I. BACKGROUND

### A. Undisputed Material Facts

Millennium Health LLC operates a laboratory that provides drug testing and medication monitoring services to healthcare professionals. Robert Mauthe, a medical doctor with a private practice in Center Valley, Pennsylvania, used Millennium Health's services on occasion to test his patients' urine samples. In doing so, Mauthe provided Millennium Health with his practice's fax number.

On May 2, 2017, Millennium Health faxed all of its customers – including Mauthe's office – a single-page flyer promoting a free educational seminar. After reporting that a large population of injured workers received opioids to treat pain, the fax explained that the free seminar would "highlight national trends in opioid misuse and abuse . . . and discuss the role of medication monitoring as a valuable tool that provides objective, actionable information during the care of injured workers." Fax (App. 224). Although Millennium Health offered one type of urine testing that could detect opioids, the fax did not mention that specific service or its availability from Millennium Health. Nor did the fax provide any pricing information, discounts, coupons, or product images.

Like the fax itself, the seminar, which was broadcast live three weeks later, did not promote any goods, services, or

property for sale. Rather, through an oral presentation, accompanied by PowerPoint slides, the seminar described statistics on opioid abuse and the role of such drugs in chronic pain management. It also explained that drug testing could help detect or monitor opioid abuse, and the seminar assessed the efficacy of several drug testing methods. One of those methods was a type of urine drug testing that Millennium Health offered, but the presentation did not indicate that Millennium Health performed that type of drug testing. That was consistent with the scope of the seminar, which did not identify providers or prices for any of the drug testing methods it reviewed. After the seminar, Millennium Health did not follow up with any registrants or attendees.

## B. Procedural History

Mauthe appreciates the opportunity presented by the damages remedy created by the TCPA for junk faxes. Through his office, he has sued fax senders in more than ten lawsuits since 2015, each seeking damages for violations of the TCPA.[1] In this case, after receiving the free-seminar fax, Mauthe, through his office, filed a putative class action in the Eastern District of Pennsylvania against Millennium Health on behalf of himself and all other recipients of the fax. In addition to the TCPA claim, the complaint also contained a state-law conversion claim for the misappropriation of paper, toner, and employee time.

Millennium Health unsuccessfully moved under Rule 12(b)(6) to dismiss those counts for failure to state a claim. In

---

[1] *See, e.g.*, *Fischbein v. Olson Rsch. Grp., Inc.*, 959 F.3d 559 (3d Cir. 2020) (consolidated with *Robert W. Mauthe, M.D., P.C. v. ITG, Inc.*); *Robert W. Mauthe, M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151 (3d Cir. 2020); *Robert W. Mauthe, M.D., P.C. v. Optum Inc.*, 925 F.3d 129 (3d Cir. 2019); *Robert W. Mauthe, M.D., P.C. v. Nat'l Imaging Assocs.*, 767 F. App'x 246 (3d Cir. 2019).

denying that motion without prejudice, the District Court allowed limited discovery "on the question of whether the fax was an advertisement or a pretext, *i.e.*, whether it was part of a larger advertising scheme." *Robert W. Mauthe, M.D., P.C. v. Millennium Health LLC*, No. 5-18-cv-01903, Order, ECF No. 43, at 1 (E.D. Pa. Jan. 10, 2019).

After completing discovery, Millennium Health successfully moved for summary judgment. The District Court explained that the fax did not constitute an unsolicited advertisement because it "promote[d] a free seminar[] rather than any commercially available product." *Robert W. Mauthe, M.D., P.C. v. Millennium Health LLC*, 2020 WL 2793954, at *6 (E.D. Pa. May 29, 2020). In reaching that conclusion, the District Court considered only the fax itself, and it did not evaluate whether the free seminar was a pretext for advertisement. *See id.* at *14. With the federal question resolved, the District Court declined to exercise supplemental jurisdiction over the state-law conversion claim and dismissed it without prejudice. *See id.* at *20 (citing 28 U.S.C. § 1367(c)(3)). The District Court had federal-question jurisdiction over the matter, 28 U.S.C. § 1331; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 377 (2012), and through a timely appeal, Mauthe invoked this Court's appellate jurisdiction, 28 U.S.C. § 1291.

## II.   DISCUSSION

The TCPA prohibits the transmission of unsolicited advertisements by fax. *See* 47 U.S.C. §§ 227(a)(5), (b)(1)(C); *Fischbein*, 959 F.3d at 561–62; *Robert W. Mauthe, M.D. P.C. v. Optum Inc.*, 925 F.3d 129, 132 (3d Cir. 2019). The statutory definition of the term 'unsolicited advertisement' does not depend on the subjective viewpoints of either the fax sender or recipient, and thus an objective standard governs whether a fax constitutes an unsolicited advertisement. *See* 47 U.S.C. § 227(a)(5); *Optum*, 925 F.3d at 133 ("[A] fax does not become an advertisement merely because the sender intended it to

5

enhance . . . its profits.").[2]  *Cf.*  47 U.S.C.  § 227(b)(3)(C) (premising treble damages on the fax sender's subjective mental state, *viz.*, a willful or knowing violation).  And substantively, to constitute an unsolicited advertisement, the fax must "promote goods or services to be bought or sold" and "have profit as an aim."  *Fischbein*, 959 F.3d at 562 (quoting *Optum*, 925 F.3d at 133); 47 U.S.C. § 227(a)(5) (adding that a fax may also promote the purchase or sale of "property").

## A. No Reasonable Recipient Would View the Free-Seminar Fax as an Unsolicited Advertisement.

Here, under an objective standard, no reasonable recipient of Millennium Health's unsolicited free-seminar fax could view it as promoting the purchase or sale of goods, services, or property.  The fax itself makes no mention whatsoever of goods, services, or property.  Instead, the fax mentions a seminar.  Nowhere in the fax is a discussion of anything that can be bought or sold – the fax speaks only about a *free* event.  The fax does not contain testimonials, product images, or coupons – things commonly associated with an advertisement.  It does not provide any email, phone number, or direct internet link to purchase a Millennium Health product or service.  The fax is purely educational – it describes research about opioids, invites attendance at an academic event, and introduces the

---

[2] *See also Fischbein*, 959 F.3d at 566 (Jordan, J., dissenting) ("[W]hat fax recipients think about the faxes they get is not legally relevant. The meaning of a statutory term does not depend on the subjective perception of litigants."); *BPP v. CaremarkPCS Health, LLC*, 53 F.4th 1109, 1113–14 (8th Cir. 2022) (holding that the fax must be "plainly understood as promoting a commercial good or service," and rejecting argument based on the subjective intent of the sender); *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1102 (11th Cir. 2019) (explaining that what the fax recipient "subjectively thought is immaterial" where objective evidence yields a contrary result).

event speaker.  For these reasons, the fax does not promote the purchase or sale of goods, services, or property.

## B.  The Pretext Theory, even if Applicable, Does Not Transform the Free-Seminar Fax into an Unsolicited Advertisement.

Nor would Mauthe's TCPA claim fare any better under the Federal Communications Commission's pretext theory, which he urges this Court to adopt.  Although the FCC's pretext theory may be construed differently, *see Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 847 F.3d 92, 101 (2d Cir. 2017) (Leval, J., concurring), Mauthe advocates for the rebuttable presumption version adopted by other circuits, which examines not only the fax for a free seminar but also the contents of the free seminar to determine whether the fax "turn[s] out to be [a] pretext for a later solicitation." *Fulton v. Enclarity, Inc.*, 962 F.3d 882, 889 (6th Cir. 2020) (internal citation omitted); *see also Physicians Healthsource*, 847 F.3d at 95.  Here, Mauthe contends, Millennium Health's fax served as a pretext for a solicitation at its later seminar.  But the free, educational seminar did not involve any such solicitation.  It did not advertise any product, service, or property.  47 U.S.C. § 227(a)(5).  Neither the presenter nor the slides discussed pricing for goods or services offered by Millennium Health.  Even after the seminar, Millennium Health did not contact seminar registrants or attendees to follow up about the drug-testing services discussed at the seminar.  Thus, nothing about the free seminar would lead a reasonable recipient of Millennium Health's fax to believe that it was an advertisement for goods, services, or property.  For that reason, even assuming *arguendo* the applicability of a version of the pretext theory allowing

7

consideration of the contents of the free seminar, the fax here would still not be an unsolicited advertisement.[3]

### III.  CONCLUSION

The District Court correctly concluded that the free-seminar fax was not an unsolicited advertisement under the TCPA, and therefore we will affirm its grant of summary judgment to Millennium Health.

---

[3] For the first time on appeal, Mauthe raises the nonobvious-promotion theory of junk-fax liability.  But it is unnecessary to evaluate whether that theory differs substantively from the FCC's pretext theory because it would fail here for the same reasons as would the pretext theory.

*Robert W. Mauthe MD PC v. Millennium Health LLC*,
No. 20-2265
PHIPPS, *Circuit Judge*, concurring.

In this appeal, Robert W. Mauthe, through his medical practice, presents the question of whether the Federal Communications Commission's pretext theory can be used to demonstrate that a fax is an unsolicited advertisement. Both the Supreme Court and this Circuit have previously declined to resolve that issue. *See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2053 (2019); *Robert W. Mauthe, M.D. P.C. v. Optum Inc.*, 925 F.3d 129, 135 (3d Cir. 2019); *Robert W. Mauthe, M.D., P.C. v. Nat'l Imaging Assocs.*, 767 F. App'x 246, 250 & n.5 (3d Cir. 2019). Although the Court's opinion today continues that trend, I write separately to explain why, in my view, the pretext theory should be rejected.

## I.

### A. The Private Cause of Action under the TCPA for Junk Faxes

Subject to exceptions not at issue in this appeal, the TCPA makes it unlawful to fax unsolicited advertisements. *See* 47 U.S.C. § 227(b)(1)(C). As defined by Congress, the term 'unsolicited advertisement' refers to "any *material* advertising the commercial availability or quality of any property, goods, or services which is *transmitted* to any person without that person's prior express invitation or permission, in writing or otherwise." *Id*. § 227(a)(5) (emphases added).

To redress a violation of that junk-fax prohibition or the FCC's implementing regulations, the TCPA authorizes a private right of action. *See id.* § 227(b)(3). Such an action may seek to enjoin the violation. *See id.* § 227(b)(3)(A). It may also pursue the greater of "actual monetary loss" or $500 in damages for each violation. *See id.* § 227(b)(3)(B). The amount of any such award may be trebled if the statutory or

regulatory violation was willful or knowing. *See id.* § 227(b)(3).

Together, these provisions enable a person receiving a fax that qualifies as an unsolicited advertisement to initiate a civil action to seek injunctive relief or damages from the fax sender.

## B. The FCC's Pretext Theory

In 2003, as part of its final rule implementing the Do-Not-Call registry, the FCC first announced the principle that an otherwise licit unsolicited communication would violate the TCPA if it served as a pretext for a prohibited advertisement. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14,014, 14,097–98 (July 3, 2003); *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 68 Fed. Reg. 44,144, 44,162 (July 25, 2003). The FCC declared that "[o]ffers for free goods or services that are part of an overall marketing campaign to sell property, goods, or services" fall within the TCPA's definition of 'unsolicited advertisements.' 18 FCC Rcd. at 14,097–98; 68 Fed. Reg. at 44,162. It then applied that pretext theory to prerecorded phone calls advertising free goods or services and concluded that those calls constituted 'unsolicited advertisements.' 18 FCC Rcd. at 14,097–98; 68 Fed. Reg. at 44,162.[1] These FCC publications, however, did not apply the free-as-pretext reasoning to faxes, and the FCC received 55 petitions seeking

---

[1] In the same publications, the FCC also observed that several classes of calls – surveys, market research, and political or religious speech calls – would generally not qualify as 'telephone solicitations.' 18 FCC Rcd. at 14,039–40; 68 Fed. Reg. at 44,147. But the FCC then stated that those types of calls would be "prohibited if they serve as a pretext to an otherwise prohibited advertisement." *Id.* at 14,039–40 n.141; 68 Fed. Reg. at 44,147 n.1; *see also* 47 U.S.C. § 227(a)(4) (defining the term 'telephone solicitation').

2

either clarification or reconsideration. *See Petitions for Reconsideration and Clarification of Action in Rulemaking Proceedings*, 68 Fed. Reg. 53,740, 53,740 (Sept. 12, 2003); *cf.* 47 C.F.R. § 1.429 (authorizing petitions for reconsideration).[2] The FCC invited oppositions to those petitions as well as replies, and it set due dates for those filings. *See* 68 Fed. Reg. at 53,740.

The FCC responded to those petitions and other comments as part of its promulgation of regulations implementing the Junk Fax Prevention Act of 2005, Pub. L. No. 109-21, § 2(h), 119 Stat. 359, 362 (July 9, 2005).[3] It did so through two publications issued a month apart in 2006: the first, in April, was labeled as a "Report and Order and Third Order on Reconsideration,"[4] and the second, in May, was entitled a

---

[2] *See, e.g.*, Request for Expedited Clarification by Proximity Marketing at 7, 12, CG Docket No. 02-278 (Aug. 6, 2003), https://www.fcc.gov/ecfs/search/search-filings/filing/5509535325; Request of Jobson Publishing L.L.C. for Reconsideration and Clarification at 1, CG Docket No. 02-278 (Aug. 25, 2003), https://www.fcc.gov/ecfs/search/search-filings/filing/5509934940.

[3] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 20 FCC Rcd. 19,758, 19,758 (Dec. 9, 2005) (explaining that the Junk Fax Prevention Act requires enactment of regulations within 270 days and inviting commentary about unsolicited facsimile advertisements).

[4] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, Report and Order and Third Order on Reconsideration, 21 FCC Rcd. 3,787 (Apr. 6, 2006).

"Final Rule"[5] (collectively, the "2006 Publications"). In virtually identical text, those 2006 Publications put forth a similar pretext theory for free-seminar faxes:

> The Commission concludes that facsimile messages that promote goods or services even at no cost, such as free magazine subscriptions, catalogs, or free consultations or seminars, are unsolicited advertisements under the TCPA's definition. In many instances, "free" seminars serve as a pretext to advertise commercial products and services. . . . Based on this, it is reasonable to presume that such messages describe the quality of any property, goods, or services.

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 71 Fed. Reg. 25,967, 25,973 (May 3, 2006) (internal quotation marks omitted); *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 21 FCC Rcd. 3,787, 3,814 (Apr. 6, 2006) (internal citation and quotation marks omitted). After announcing the pretext theory and making other declarations in its 2006 Publications, the FCC recognized that "facsimile senders may need additional time beyond 30 days to comply with the rules adopted herein." 71 Fed. Reg. at 25,974; *see also* 21 FCC Rcd. at 3,815–16. Accordingly, the FCC set an effective date of August 1, 2006 – 90 days after the second publication. *See* 71 Fed. Reg. at 25,974; *see also* 21 FCC Rcd. at 3815–16.

---

[5] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, Final Rule, 71 Fed. Reg. 25,967 (May 3, 2006).

## II.

### A. The Specter of Hobbs Act Exclusive Jurisdiction

Although this Court ordinarily has subject-matter jurisdiction over TCPA claims, *see Mims v. Arrow Fin. Servs. LLC*, 565 U.S. 368, 377 (2012), any consideration of the FCC's pretext rule may be governed by the exclusive jurisdiction provisions in the Administrative Orders Review Act. *See* Administrative Orders Review Act, Pub. L. No. 81-901 § 2, 64 Stat. 1129, 1129 (1950) (currently codified at 28 U.S.C. § 2342). That federal statute, commonly referred to as the 'Hobbs Act,' grants exclusive jurisdiction to federal appellate courts to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of," among other things "all final *orders* of the Federal Communications Commission [under the Communications Act of 1934] made reviewable by [47 U.S.C. § 402(a)]." 28 U.S.C. § 2342(1) (emphasis added). To challenge such an order requires a petition filed with a federal appellate court within 60 days of the order. *See id.* § 2344.

The Supreme Court has outlined two circumstances in which a TCPA claim based on the pretext theory would not fall within the exclusive jurisdiction provision in the Hobbs Act. *See PDR Network*, 139 S. Ct. at 2055. The first depends on whether the pretext theory is an interpretive rule or a legislative rule. *See id.* If the pretext theory is an interpretive rule, then it would not be within the exclusive jurisdiction of the Hobbs Act. *See id.*; *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 263 (4th Cir. 2020) (concluding that the pretext theory is an interpretive rule outside of exclusive jurisdiction of the Hobbs Act). The second circumstance occurs when a party sued in a civil action under the TCPA lacked a "prior, adequate, and exclusive opportunity for judicial review." *PDR Network*, 139 S. Ct. at 2055–56 (quoting 5 U.S.C. § 703) (emphasis omitted). Without such an opportunity, the special statutory review provision in the Administrative Procedure Act, *see* 5 U.S.C. § 703, would prevent the Hobbs Act from applying to such a party's

5

challenge to the FCC's pretext theory in a private civil action brought under the TCPA. *See PDR Network*, 139 S. Ct. at 2056.

## B. This Case Does Not Fall Within the Exclusive Jurisdiction of the Hobbs Act.

The first inquiry identified by the Supreme Court – the interpretive-rule / legislative-rule question – need not be answered in full to foreclose the application of the exclusive jurisdiction provision in the Hobbs Act to the FCC's pretext theory. Critically, with respect to the FCC, the Hobbs Act's exclusive jurisdiction provision applies only to final *orders*. *See* 28 U.S.C. § 2342(1). And in administrative law, orders are not rules; the two are mutually exclusive. *See* 5 U.S.C. § 551(6) (defining orders to exclude rules). Thus, if the pretext theory is a rule of any kind, then it is not an order subject to the Hobbs Act. *Cf. PDR Network*, 139 S. Ct. at 2055 (assuming without deciding that the pretext theory was announced in an order not a rule because the parties did not dispute that point below (citing *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 464 n.1 (4th Cir. 2018))).

Sometimes distinguishing a rule from an order can be "a difficult exercise." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993). But in framing the inquiries about the Hobbs Act's applicability to the FCC's 2006 Publications, the Supreme Court strongly foreshadowed that the pretext theory is a rule, not an order. By first asking whether the pretext theory is an interpretive *rule* or a legislative *rule*, *see PDR Network*, 139 S. Ct. at 2055, the Supreme Court all but answered the rule-order question since in neither scenario would the pretext theory be an *order*. The Supreme Court also seemingly revealed the answer to the rule-order issue through its second inquiry, which concerned the applicability of special statutory review. Under the Administrative Procedure Act, a party may raise a challenge to agency action in an enforcement proceeding if that party did not have a "prior, adequate, and exclusive opportunity for judicial review." 5 U.S.C. § 703.

6

But the availability of an opportunity for such pre-enforcement judicial review is relevant only to agency *rules* because there is no such thing as pre-enforcement review of an agency order – an order is a form of enforcement. *See PDR Network*, 139 S. Ct. at 2062 (Kavanaugh, J., concurring) ("Congress traditionally takes the extraordinary step of barring as-applied review in enforcement proceedings *only* in those statutory schemes where the regulated parties are likely to be well aware of any agency *rules* and to have both the incentive and the capacity to challenge *those rules* immediately." (emphases added)). Thus, by designing an inquiry that examines the applicability of the special statutory review provision, which applies only to rules, the Supreme Court again strongly implied that the pretext theory announced in the FCC's 2006 Publications is a rule, outside of the exclusive jurisdiction of the Hobbs Act.

A more formal analysis confirms that the FCC's announcement of the pretext theory for free-seminar faxes in the 2006 Publications is a rule. The rule-order distinction is a fault line in administrative law: it separates two adjacent concepts that together comprise a continental foundation for regulation by administrative agencies. *See United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973) (recognizing the "distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other"). A rule has three essential qualities: (i) future effect; (ii) the capacity for actual general applicability, as opposed to merely the use of general terms that would apply only to a small, discrete set of persons; and (iii) an abstract statement "designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4); *see also Columbia Broad. Sys. v. United States*, 316 U.S. 407, 418 (1942) ("Unlike an administrative order or a court judgment adjudicating the rights of individuals, which is binding only on the parties to the

7

particular proceeding, a valid exercise of the rule-making power is addressed to and sets a standard of conduct for all to whom its terms apply."); *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332–33 (D.C. Cir. 2017).  By contrast, an order, which is distinct from a rule, *see* 5 U.S.C. § 551(6), is an agency "disposition" of a "matter," *id.*, arrived at through "adjudication," *id.* § 551(7), that is the concrete application of legal principles to a specific party based on its particular circumstances.  *Compare Londoner v. City & Cnty. of Denver*, 210 U.S. 373, 385 (1908) (holding that a disposition is sufficiently adjudicative to require procedural due process protections if it results in an "irrevocably fixed" outcome), *with Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915) (holding that a "general determination" dealing only with a "principle" and not applying it based on "individual grounds" is not sufficiently adjudicative to require due process).

The FCC's pretext theory possesses the essential qualities of a rule.  Announced in April and May of 2006 with an effective date of August 1, 2006, it had a future effect.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 221 (1988) (Scalia, J., concurring) ("Adjudication deals with what the law was; rulemaking deals with what the law will be." (emphasis omitted)); *Safari Club*, 878 F.3d at 332 ("[R]ules generally have only 'future effect' while adjudications immediately bind parties by retroactively applying law to their past actions.").[6] The FCC's pretext theory also has the capacity for general applicability.  The pretext theory applies to all fax senders and

---

[6] *Cf. Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 196 (D.C. Cir. 2009) (observing that there was no dispute that "a principle announced in adjudication is necessarily retroactive" (citing *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 311–12 (1994))); *but cf.* Ronald M. Levin, *The Case for (Finally) Fixing the APA's Definition of "Rule"*, 56 Admin. L. Rev. 1077, 1088 (2004) (arguing that the future-effect requirement does little, if anything, to distinguish rules from orders).

is not limited to any specific parties, such as those who petitioned for clarification or reconsideration of the FCC's prior publication. *See Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017) ("Rulemaking scenarios generally involve broad applications of more general principles rather than case-specific individual determinations."). In addition, the pretext theory is an abstract statement designed to implement, interpret, or prescribe law or policy. *See* 5 U.S.C. § 551(4). Instead of resolving a specific dispute or making an individualized determination, the pretext theory states the FCC's position that free-seminar faxes should be treated as unsolicited advertisements. *See Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 688 (7th Cir. 2013) (suggesting that the FCC's 2006 Publications are "best understood as a declaration of the Commission's enforcement plans").

As corroboration of the conclusion that the pretext theory is a rule, the FCC's actions, both before and after the 2006 Publications, treat it as such. To formulate the free-seminar pretext theory, the FCC engaged in notice-and-comment rulemaking, not an adjudicative hearing. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 67 Fed. Reg. 62,667, 62,667, 62,679 (Oct. 8, 2002) (issuing "Notice of proposed rulemaking" and seeking "comment on whether the Commission's rules need to be revised"); *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 17 FCC Rcd. 17,459, 17,496 (Sept. 18, 2002) ("This is a non-restricted notice and comment rulemaking proceeding."). Similarly, in explaining its extension of the effective date, the FCC stated that fax senders needed additional time to comply "with the *rules* adopted herein." 71 Fed. Reg. at 25,974 (emphasis added); 21 FCC Rcd. at 3,816 (emphasis added). And the 2006 Publications also instructed that several of their provisions be codified in regulation. *See* 71 Fed. Reg. at 25,977–79 (specifying the text of or amendments to regulations); 21 FCC Rcd. at 3,819–21 (same).

For completeness, the FCC's free-seminar pretext theory also lacks the essential qualities of an order. It does not concretely apply legal principles to any specific parties based on their particular circumstances. *Cf. Mallenbaum v. Adelphia Commc'ns Corp.*, 74 F.3d 465, 468 (3d Cir. 1996) (explaining that an FCC regulation is an order if it "requires a defendant to take concrete actions"). More acutely, the 2006 Publications do not mention Millennium Health or its May 2017 fax promoting a free seminar.

Although the FCC titled the first of the 2006 Publications as a "Report and Order and Third Order on Reconsideration," that does not alter the pretext theory's status as a rule.[7] An agency's label for an action is not dispositive of the action's essence, and not everything labeled as an 'order' is actually an order. *See Columbia Broad. Sys.*, 316 U.S. at 416 (recognizing that not everything the FCC labels as an 'order' is in fact an order and explaining that "[t]he particular label placed upon [the Commission's action] by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive"); *New Eng. Tel. & Tel. Co. v. Pub. Utils. Comm'n of Me.*, 742 F.2d 1, 8–9 (1st Cir. 1984) (Breyer, J.) (holding that an FCC decision labeled as a 'Memorandum Opinion and Order' was not actually an order); *cf. Safari Club*, 878 F.3d at 332 ("An agency may not escape the requirements of [notice-and-comment rulemaking] by labeling its rule an 'adjudication.'" (internal citations omitted)).

---

[7] As matter of administrative procedure, the FCC is not bound by a separate judgment rule, *cf.* Fed. R. Civ. P. 58(a), and the title for the first publication seems to reflect its function of resolving the petitions for clarification and reconsideration. But after performing that operation, the remainder of that publication, like the entirety of the near-identical second publication, had the essential qualities of a rule. *See* 5 U.S.C. § 551(4); *Bi-Metallic*, 239 U.S. at 446.

10

For these reasons, the FCC's free-seminar pretext theory is a rule. As such, it falls outside of the Hobbs Act's exclusive jurisdiction provision, which applies only to "final orders" of the FCC. 28 U.S.C. § 2342(1). Thus, the Hobbs Act does not prevent a district court (or this Court on direct appeal) from evaluating the validity of the pretext theory in private civil actions under the TCPA.

## III.

Mauthe invokes the pretext theory to sustain his TCPA claim. One problem with the FCC's pretext theory is that it is ambiguous. It may be construed as a rebuttable presumption[8] or as a categorical rule.[9] If the pretext theory is valid, then that distinction could be dispositive in many cases. Here, for instance, Millennium Health has rebutted the presumption that its free-seminar fax served as a pretext to advertise commercial products and services. The seminar itself did not advertise any products or services, nor did Millennium Health contact registrants or attendees afterwards to follow-up about the drug-testing services discussed at the seminar. But under the categorical application of the pretext theory, which Mauthe does not advance, the free-seminar fax would be an unsolicited advertisement without consideration of Millennium Health's

---

[8] *See Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 847 F.3d 92, 95 (2d Cir. 2017); *see also* 71 Fed. Reg. at 25,973 ("[I]t is reasonable to presume that such messages describe the 'quality of any property, goods, or services.'"); *cf. Matthew N. Fulton, D.D.S., P.C. v. Enclarity, Inc.*, 962 F.3d 882, 891 (6th Cir. 2020).

[9] *See Physicians Healthsource*, 847 F.3d at 101 (Leval, J., concurring); *see also* 71 Fed. Reg. at 25,973 ("The Commission concludes that facsimile messages that promote goods or services even at no cost, such as . . . free consultations or seminars, are unsolicited advertisements under the TCPA's definition").

marketing practices or the details or character of the free seminar that the fax promoted.

Taking a step back, however, reveals that the FCC's pretext theory, under either formulation, involves consideration of facts extrinsic to the fax itself. Both versions rely on the FCC's assessment of prevalent marketing practices for commercial products and services. *See* 71 Fed. Reg. at 25,973; 21 FCC Rcd. at 3,814. And the rebuttable presumption version also examines whether the free seminar was used to advertise products or services. *See Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 847 F.3d 92, 97 (2d Cir. 2017). But the TCPA confines the meaning of the term 'unsolicited advertisement' to the *material transmitted*, defining it in relevant part as "any *material* advertising the commercial availability or quality of any property, goods, or services, which is *transmitted* to any person." 47 U.S.C. § 227(a)(5) (emphases added); *BPP v. CaremarkPCS Health, LLC*, 53 F.4th 1109, 1113 (8th Cir. 2022) ("The fax itself, and not just the underlying property, good, or service, must have a commercial component . . . ."). Consistent with that limiting principle, this Circuit, even in recognizing other novel strands of junk-fax liability under the TCPA, such as liability for paid responses to market research surveys and third-party seller liability, has tethered the meaning of 'unsolicited advertisement' to the text of the fax itself. *See Fischbein v. Olson Rsch. Grp., Inc.*, 959 F.3d 559, 562–63 (3d Cir. 2020) (concluding that a fax offering to pay for market research responses constituted an unsolicited advertisement by examining only the contents of a fax to assess whether it highlighted the availability of a transaction); *Optum*, 925 F.3d at 132–33 (articulating three elements of third-party seller liability that can be determined from an "examination *of the fax*," and which all related to the core showing that "*the fax* must convey the impression . . . that a seller is trying to make a sale" (emphasis added) (internal citation and quotation marks omitted)). Similarly, the Supreme Court, in more recently interpreting the term 'autodialer,' focused on the text of the

12

TCPA, and rejected the argument that the term's meaning should account for broad concerns about "intrusive telemarketing practices." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169–72 (2021).

Yet, in formulating the pretext theory, the FCC relied on its assessment of prevalent marketing practices to enlarge the statutory definition of 'unsolicited advertisement.' *See* 71 Fed. Reg. at 25,973 (finding that "in many instances" free-seminar faxes operate as a pretext). But even sound agency factfinding cannot justify a rule that contravenes statutory text. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002) ("A regulation cannot stand if it is 'arbitrary, capricious, or manifestly contrary to the statute.'" (quoting *United States v. O'Hagan*, 521 U.S. 642, 673 (1997))); *LaVallee Northside Civic Ass'n v. V.I. Coastal Zone Mgmt. Comm'n*, 866 F.2d 616, 623 (3d Cir. 1989) ("[A]n administrative agency's regulation that conflicts with the parent statute is ineffective."); *see also CaremarkPCS*, 53 F.4th at 1113 (explaining that courts are not required to defer to the FCC's interpretation of 'unsolicited advertisement' and noting that the statute's definition "is not ambiguous"). Accordingly, because both variations of the FCC's pretext theory expand the meaning of the term 'unsolicited advertisement' so that it depends on facts beyond those contained in the fax, they cannot be reconciled with the TCPA, which defines that term in reference to only the material

transmitted.[10]  As a rule in contravention of statutory text, the FCC's free-seminar pretext theory has no legal effect.[11]

\* \* \*

For the foregoing reasons, this Court may consider and should reject the FCC's pretext theory as a valid basis for liability under the TCPA.

---

[10] Unlike the term, 'unsolicited advertisement,' other elements of TCPA claims and defenses are not limited to the material transmitted.  For instance, proof of an established business relationship is not confined to the contents of a fax.  *See* 47 U.S.C. § 227(a)(2); 47 C.F.R. § 64.1200(f)(5), (6).  Nor is proof that a prohibited communication was sent knowingly and willfully for purposes of treble damages limited to the material transmitted.  *See* 47 U.S.C. § 227(c)(3).

[11] As an alternative to the pretext theory, Mauthe advances the very similar nonobvious-promotion theory, which this Circuit has never endorsed.  That theory, too, looks beyond the contents of the fax to determine whether the fax is an 'unsolicited advertisement,' and due to that flaw, it contravenes the text of the TCPA and cannot be a basis for junk-fax liability.  *See id.* § 227(a)(5).

14